UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:16-cr-00029-MMD-WGC-1 |
| Plaintiff, | ORDER |
| v. | |
| ROBERT GENE RAND, | |
| Defendant. | |

## I.    SUMMARY

Robert Gene Rand, a former medical doctor who admitted to intentionally overprescribing opioids for years, is currently serving a 96-month sentence for involuntary manslaughter, 18 U.S.C. § 1112(a), and a concurrent 120-month sentence for distribution of a controlled substance, 21 U.S.C. § 841(a)(1), (b)(1)(C), following a guilty plea, at one of the minimum-security camps contained within Federal Correctional Complex Lompoc ("Lompoc"). (ECF Nos. 668, 749 at 1, 758 at 4, 8.) Before the Court is Mr. Rand's third[1] motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i) based on the "extraordinary and compelling reasons" presented by the COVID-19 pandemic as applied to his health and particular circumstances, and, alternatively, the incapacitation of his wife and minor child's caregiver because she has been diagnosed with breast cancer (ECF No. 792 ("Motion")), along with two associated motions to seal (ECF Nos. 793, 798).[2] As further explained below, the Court will deny the Motion because Mr. Rand declined COVID-19 vaccination, has proffered insufficient evidence to establish his wife's

---

[1]The Court denied Mr. Rand's first motion for compassionate release. (ECF No. 770.) Mr. Rand filed a second motion *pro se*, but then withdrew it. (ECF Nos. 782, 786.)

[2]The government opposes his release. (ECF No. 797.) Defendant also filed a reply in support of his Motion. (ECF No. 800.)

1  incapacitation, and has not shown that the applicable sentencing factors and policy

2  statements weigh in favor of his release.

3  **II.    BACKGROUND**

4      The Court incorporates by reference the factual background it provided in its prior

5  order denying Mr. Rand's first motion for compassionate release and does not restate it

6  here. (ECF No. 770 at 2-3.) The Court instead summarizes the facts that have either

7  changed since that order or were not before the Court when it issued that order.

8      First, and most notably as to the portion of Mr. Rand's "extraordinary and

9  compelling circumstances" argument regarding his own health conditions, Mr. Rand was

10  offered the Pfizer COVID-19 vaccine on December 30, 2020, but he declined it. (ECF No.

11  799 (sealed).)

12      Second, Mr. Rand's wife, Melissa Rand, was diagnosed with Metastatic Breast

13  Cancer in February 2021. (ECF No. 800-3 at 3.) She states that she is "anemic, weak,

14  fatigued, with an inflamed liver, and have neuropathy in my hands and feet." (*Id.* at 3.)

15  But she also states that she has "not undergone surgery or radiation treatments yet." (*Id.*)

16  She further states that she is the sole caregiver for her and Mr. Rand's daughter, and she

17  would like both his help with raising their daughter and managing her own illness. (*Id.* at

18  2-4.) The Court will discuss Mr. Rand's proffered evidence regarding his wife's illness in

19  more detail *infra*.

20      Third, according to the government in reliance on the Bureau of Prisons ("BOP")'s

21  records, the COVID-19 outbreak at Lompoc has subsided, in part because many inmates

22  at Lompoc are now vaccinated against COVID-19. (ECF No. 797 at 13.)

23      Fourth, Mr. Rand has served more of his sentence, as some time has elapsed

24  since the Court denied his first motion for compassionate release. He has now served

25  over five years of his sentence. (ECF No. 792 at 3.)

26      Fifth, Mr. Rand proffers some letters in support of his release from people who

27  have come to know him while he has been incarcerated, specifically Staff Chaplain R.

28  Paul Lasley (ECF No. 792-4 at 2), and B. Rains, General Maintenance Foreman (*id.* at

1   5). Mr. Rand similarly proffers some letters in support of his release from his friends Fran

2   V. Aparones (*id.* at 3-4), Phyllis Erichsen (ECF No. 800-2 at 2-3) and Mayvelyn Erichsen

3   (*id.* at 4).

4          Sixth, Mr. Rand proffers a job offer that he could presumably accept were he

5   released, as a Medical Specialist within the Science Department of the Catholic Online

6   School. (ECF No. 800-1 at 2.) Mr. Rand also states through his attorney that he "will

7   provide financial support [for his family] through gig employment" if he is released. (ECF

8   No. 792 at 26.)

9          Finally, as to satisfaction of the administrative prerequisites before bringing this

10   compassionate release motion, Mr. Rand submitted a request to the warden of Lompoc

11   on March 3, 2021. (ECF No. 792-2 at 2.) The warden denied his request. (*Id.* at 3.) Mr.

12   Rand then filed a request for administrative remedy on March 22, 2021. (*Id.* at 4-6.) He

13   filed this Motion on June 14, 2021.

14   **III.   LEGAL STANDARD**

15          Mr. Rand specifically seeks release under the compassionate release provision of

16   18 U.S.C. § 3582(c)(1)(A)(i), as amended by the First Step Act of 2018. (ECF No. 792 at

17   1-2.) This provision offers Mr. Rand a limited exception to the general rule that the Court

18   may not modify or reduce the length of a sentence after the Court has imposed it. *See* 18

19   U.S.C. § 3582(c); *see also United States v. Penna*, 319 F.3d 509, 511 (9th Cir. 2003)

20   (explaining that generally a court cannot modify a sentence after it has imposed it). "It

21   allows the sentencing judge to reduce a sentence based on 'extraordinary and compelling

22   reasons' after the defendant has asked the BOP to bring such a motion on her behalf and

23   exhausted all administrative rights to appeal the BOP's denial of that request." *United*

24   *States v. Mogavero*, Case No. 2:15-cr-00074-JAD-NJK, 2020 WL 1853754, at *2 (D. Nev.

25   Apr. 13, 2020) (citing 18 U.S.C. § 3582(c)(1)(A)(i)). Moreover, before granting such a

26   request, the Court "must consider the factors in 18 U.S.C. § 3553(a) 'to the extent that

27   they are applicable,' and any sentence reduction must be 'consistent with applicable

28   policy statements issued by the Sentencing Commission.'" *Id.* (citations omitted).

1    **IV.    DISCUSSION**

2          The Court follows a three-step process to evaluate the Motion. The Court first

3    addresses whether Mr. Rand has satisfied the statutory prerequisites under Section

4    3582(c)(1)(A), then whether Mr. Rand has shown "extraordinary and compelling reasons"

5    for the Court to release him under Section 3582(c)(1)(A)(i), and then addresses the

6    applicable sentencing factors and policy statements, as it must under Section

7    3582(c)(1)(A).

8          **A.    Statutory Prerequisites**

9          Section 3582(c)(1)(A) requires that a defendant ask the BOP to bring a motion for

10   compassionate release on the defendant's behalf before filing such a motion with the

11   Court, normally done—as here—by submitting a request to the warden. (ECF No. 792-

12   2.) *See also* 18 U.S.C. § 3582(c)(1)(A). In addition, a defendant may only bring a motion

13   under Section 3582(c)(1)(A) "after the defendant has fully exhausted all administrative

14   rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's

15   behalf or the lapse of 30 days from the receipt of such a request by the warden of the

16   defendant's facility, whichever is earlier[.]" *Id.*

17         There is no dispute that Mr. Rand has satisfied these prerequisites here. (ECF

18   Nos. 792 at 17, 792-2; *see also* ECF No. 797 (declining to dispute that Mr. Rand has

19   satisfied the statutory prerequisites here).) The Court accordingly moves on to the next

20   step of the analysis—whether Mr. Rand has shown extraordinary and compelling reasons

21   that weigh in favor of granting his Motion.

22         **B.    "[E]xtraordinary and compelling reasons"**

23         To prevail on the "extraordinary and compelling reasons" prong of the analysis, Mr.

24   Rand must establish such reasons exist as to: "(1) the medical condition of the defendant,

25   (2) the age of the defendant, (3) family circumstances, or (4) any other extraordinary or

26   compelling reason, as determined by the Director of the Bureau of Prisons." *United States*

27   *v. Morrison*, 501 F. Supp. 3d 957, 959 (D. Nev. 2020) (citing U.S. SENTENCING

28   GUIDELINES MANUAL § 1B1.13 app. n.1 (U.S. SENTENCING COMM'N 2018)). The

4

1   Court's approach to this Motion is informed by U.S.S.G. § 1B1.13, particularly as to Mr.

2   Rand's argument about his wife's incapacitation, though the Court acknowledges it is not

3   bound by U.S.S.G. § 1B1.13. *See United States v. Aruda*, 993 F.3d 797, 802 (9th Cir.

4   2021) ("The Sentencing Commission's statements in U.S.S.G. § 1B1.13 may inform a

5   district court's discretion for § 3582(c)(1)(A) motions filed by a defendant, but they are not

6   binding.")

7        In his Motion, Mr. Rand makes two alternative arguments on the "extraordinary

8   and compelling reasons" prong. He argues that his wife is incapacitated because of her

9   breast cancer diagnosis and therefore cannot care for their daughter, so the Court should

10  release Mr. Rand so he may assist with caring for his daughter. (ECF No. 792 at 17-19.)

11  But the Court first addresses Mr. Rand's other argument—that his serious medical

12  conditions pose a significant risk of serious complications if he contracts COVID-19. (*Id.*

13  at 19-21.)

14                    **1.      Mr. Rand's Medical Conditions**

15       Mr. Rand's Motion extensively describes his underlying health conditions[3] and

16  therefore argues that "he is at increased risk for complications from COVID-19" were he

17  to contract it, especially considering his incarceration. (*Id.* at 6-14, 19-21.) However, he

18  fails to mention in his Motion that he was offered the Pfizer COVID-19 vaccine and

19  declined it, which the government points out in its response. (ECF No. 797 at 5; *see also*

20  ECF No. 799 (sealed).) This renders Mr. Rand's argument about his susceptibility to a

21  severe case of COVID-19 in his Motion largely irrelevant and makes this case

22  distinguishable from *United States v. Kauwe*, 467 F. Supp. 3d 940, 947-49 (D. Nev. 2020),

23  upon which Mr. Rand relies (ECF No. 792 at 19), because the Court issued *Kauwe* before

24  a vaccine was available at all, much less widely available like it is now.

25       In his reply, Mr. Rand concedes that he declined the Pfizer COVID-19 vaccine

26  when it was offered to him on December 30, 2020, but argues his decision was

27  _____

28       [3]This description is mostly based on Exhibit D to his Motion, which purportedly
    consists of medical records, but Mr. Rand's counsel did not file a sealed copy of Exhibit
    D in compliance with LR IA 10-5, so the Court cannot say what that exhibit contains.

1   reasonable. (ECF No. 800 at 5-10.) To start, the Court disagrees. Mr. Rand's decision to

2   decline the Pfizer COVID-19 vaccine weighs definitively against granting his Motion

3   based on the risk that Mr. Rand may suffer serious complications if he contracts COVID-

4   19. *See, e.g.*, *United States v. Baeza-Vargas*, Case No. CR1000448010PHXJAT, ---

5   F.Supp.3d ----, 2021 WL 1250349, at *3 (D. Ariz. Apr. 5, 2021) ("Judges of this Court, as

6   well as others around the country, have ruled with consistency that an inmate's denial of

7   a COVID-19 vaccination weighs against a finding of extraordinary and compelling

8   circumstances."). Further, the Court finds Mr. Rand's arguments in his reply potentially

9   sanctionable.[4]

10      Mr. Rand first argues he declined the vaccine because he "a practicing Jew, and

11  he was advised by his Rabbi that observant Jews should not receive the vaccine due to

12  its use of 'fetal parts.'" (ECF No. 800 at 5.) However, Mr. Rand offers no declaration from

13  his Rabbi or even himself to allow the Court to verify that his Rabbi actually said this. And

14  even if he had, Mr. Rand proffers no evidence suggesting that this is a tenant of the

15  Jewish faith, instead of an outlier view espoused by a single person. Moreover, the

16  statement attributed to the Rabbi is false, as demonstrated by the very source Mr. Rand

17  relies on in the sentences following this very sentence. (*Id.*) The Reuters article upon

18  which Mr. Rand relies debunks the falsehood that the Johnson and Johnson COVID-19

19  vaccine—which is not the vaccine Mr. Rand declined (ECF No. 799 (sealed))—is made

20  with fetal parts. *See* Reuters Fact Check, *Fact Check-Johnson & Johnson's COVID-19*

21  *vaccine does not contain aborted fetal cells* (April 1, 2021),

22  https://www.reuters.com/article/factcheck-johnson-aborted-idUSL1N2LU1T9. The article

23  does state, however, that "The Pfizer/BioNTech and Moderna vaccines used fetal cell

24  lines in their testing stages." *Id.* But that is not the same as saying the Pfizer vaccine itself

25  contains "fetal parts." This argument is therefore misleading and unsupported, at best.

26

27      [4]This and other issues discussed throughout this order are more likely attributable
    to Mr. Rand's counsel than Mr. Rand himself. The Court is therefore concurrently issuing
28  an order to show cause directed at Mr. Rand's counsel, Mr. Sample, as to why he should
    not be sanctioned by having his *pro hac vice* status revoked in this case. The Court offers
    additional explanation in that order to show cause.

Mr. Rand next argues that he reasonably declined the Pfizer vaccine because it was offered to him on December 30, 2020, shortly after it received an Emergency Use Authorization, and, as a former doctor, Mr. Rand wanted to wait until there was more data supporting its safety and efficacy, cognizant that some drugs have been found to be unsafe even after receiving full FDA approval. (ECF No. 800 at 6-10.) This argument is unpersuasive because it does not explain why Mr. Rand still refuses to get a COVID-19 vaccine. Though it postdates even his reply, the Pfizer COVID-19 vaccine has since been given full approval, *see* U.S. Food and Drug Administration, *FDA Approves First COVID-19 Vaccine* (August 23, 2021), https://www.fda.gov/news-events/press-announcements/fda-approves-first-covid-19-vaccine, and the Court sees no reason why Mr. Rand did not file a supplement to respond to this significant development. Mr. Rand's argument also ignores the growing consensus around the safety and efficacy of the Pfizer COVID-19 vaccine since he declined it. Moreover, Mr. Rand's statement that "his opinion that the risk of taking an experimental vaccine outweighs the dangerous risks he faces if he were to contract COVID-19 with his high-risk conditions" is both no longer accurate and undermines his argument that he should be released because it acknowledges that he is not as concerned about the risk of contracting a severe case of COVID-19 as his Motion would otherwise suggest. (ECF No. 800 at 10.)

Mr. Rand also relies on an online article published by Children's Health Defense to make the argument that his vaccine hesitancy is reasonable. (*Id.* at 8-9, 8 n.13, 9 n.14.) Children's Health Defense is not a reputable source. To the contrary, one study found that Children's Health Defense was one of two organizations that spread the majority of vaccine misinformation on Facebook. *See* Lena H. Sun, *Majority of anti-vaccine ads on Facebook were funded by two groups*, THE WASHINGTON POST (November 15, 2019), *available at* https://web.archive.org/web/20191117003403/https://www.washingtonpost.com/health/2019/11/15/majority-anti-vaccine-ads-facebook-were-funded-by-two-groups/.    Similarly, another study also found Children's Health Defense was a major source of vaccine

misinformation. *See* Center For Countering Digital Hate, *The Anti-Vaxx Playbook* (Last Visited          September          24,          2021),          *available          at* https://web.archive.org/web/20201230074238/https://252f2edd-1c8b-49f5-9bb2-cb57bb47e4ba.filesusr.com/ugd/f4d9b9_25e2a7b73e8c4236a53c1002db4017b4.pdf.

Thus, the fact that Mr. Rand relies on statistics from an article published by Children's Health Defense renders his argument about his decision to decline the Pfizer COVID-19 vaccine even less persuasive. In sum, the Court finds that Mr. Rand's argument regarding his health conditions and decision not to receive a COVID-19 vaccine does not constitute an extraordinary and compelling reason weighing in favor of granting his Motion. The Court accordingly moves on to his argument that the Court should release him because his wife has been diagnosed with breast cancer.

### 2.    Incapacitated Caregiver

According to the U.S. Sentencing Commission, exigent family circumstances rendering compassionate release cognizable include the "incapacitation of the caregiver of the defendant's minor child or minor children." U.S. SENTENCING GUIDELINES MANUAL § 1B1.13 app. n.1(C)(i) (U.S. SENTENCING COMM'N 2018). Although there is currently no universal standard for evaluating a caregiver's "incapacitation," other district courts have relied on guidance provided by the BOP when considering compassionate release or Reduction in Sentence ("RIS") requests under 18 U.S.C. §§ 3582 and 4205(g) based on a caregiver's incapacitation. *See, e.g.*, *United States v. Collins*, Case No. 15-10188-EFM, 2020 WL 136859 (D. Kan. Jan. 13, 2020); *United States v. Gutierrez*, Case No. CR 05-0217 RB, 2019 WL 2422601 (D.N.M. June 10, 2019). The Court will take the same approach here.

For requests based on non-medical circumstances (of the inmate), the BOP understands "incapacitation" to mean "the family member caregiver suffered a severe injury (e.g., auto accident) or suffers from a severe illness (e.g., cancer) that renders the caregiver incapable of caring for the child." Bureau of Prisons, *Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582*

1   *and 4205(g)*, at 7 (Last Visited September 24, 2021),
2   https://www.bop.gov/policy/progstat/5050_050_EN.pdf ("Compassionate Release
3   Procedures"). In considering these requests, the warden engages in a two-stage review
4   process; the first stage requires an inmate release plan, as well as statements as to the
5   caregiver's incapacitation and that the caregiver "was the only family member capable of
6   caring for the inmate's child." *Id.* This stage also requires "verifiable medical
7   documentation" attesting to the caregiver's incapacitating medical condition as well as
8   "verifiable documentation" of the inmate's parental relationship to the minor child. *Id.* The
9   second stage of the warden's review requires further factual investigation and verification,
10  with an emphasis on the nature of the child's care during the inmate's incarceration and
11  the caregiver's incapacitation. At the second stage, the BOP further assesses
12  incapacitated caregiver compassionate release or RIS requests in consideration of
13  several factors, including but not limited to the nature and circumstances of the inmate's
14  offense, the inmate's history with the child, comments from victims, the length of sentence
15  and amount of time served, and the inmate's release plans. *See id.* at 8-9, 12. As noted,
16  the Court will apply this BOP guidance in determining whether Mr. Rand has shown
17  "extraordinary and compelling reasons" weigh in favor of granting him compassionate
18  release.

19          While Mrs. Rand's cancer is a severe illness that could render her incapable of
20  caring for her child—and the Court is of course very sorry to hear about it and wishes her
21  well—Mr. Rand has not presented sufficient evidence in his Motion to establish that Mrs.
22  Rand is incapacitated, meaning unable to care for her daughter. The Court accordingly
23  finds that Mrs. Rand's cancer diagnosis does not constitute an extraordinary and
24  compelling reason weighing in favor of Mr. Rand's release given the evidence proffered
25  with the Motion.

26          To start, the description of Mrs. Rand's condition offered in the Motion is mostly
27  based on a letter from a Dr. Lee. (ECF No. 792 at 4-5.) However, Mr. Rand's counsel did
28  not submit the letter from Dr. Lee to the Court, so the Court cannot verify what it says.

Moreover, the description of the contents of Dr. Lee's letter in the Motion is written in the speculative, future tense, such that the Court cannot say that any of the potentially negative side effects described in the Motion have actually occurred. The Court also cannot say why Mr. Rand's counsel did not supplement the motion with more up-to-date information, as that would have helped the Court assess Mrs. Rand's current condition. The missing letter from Dr. Lee thus does not shed much light on Mrs. Rand's condition. And the information in the letter appears to be stale and speculative in any event.

Moreover, other statements in the Motion are not supported by evidence, though they are the sort of factual statements that could be. One example is the statement that Mrs. Rand suffers from extreme social anxiety. (*Id.* at 5.) Another example are the statements to the effect that Mr. and Mrs. Rand have no family or friends that could assist with caring for their daughter. (*Id.*; *see also id.* at 18-19.) The same goes for the statement, "Mrs. Rand's ability to function is significantly impaired and it will continue to decline as her treatments progress." (*Id.* at 18.) That said, while the statements that Mrs. Rand suffers from "chemo brain" and extreme fatigue were bizarrely offered on information and belief in the initial Motion (ECF No. 792 at 4), Mrs. Rand basically confirmed she suffers from those symptoms in her letter offered along with the reply brief (ECF No. 800-3 at 3). But regardless, there is a dearth of evidence in the Motion that would allow the Court to conclude that Mrs. Rand is incapacitated to such an extent that she cannot care for her daughter.

The statements to the effect that Mrs. Rand has no family that can help her also raise further questions. First, they seem to be at odds with the Court's reading of the presentence investigation report—that Mr. Rand grew up around a large extended family and was very close with his father until his father's passing. Is it really the case nobody in Mr. Rand's family is able to assist? It is hard for the Court to say given the minimal, if any, pertinent evidence provided. Second, it appears that Mrs. Rand moved with her daughter to Bakersfield to be closer to Mr. Rand at Lompoc. That is understandable, even laudable. But now that circumstances have changed because of Mrs. Rand's cancer diagnosis,

10

1    perhaps it would be more reasonable to move somewhere else where Mrs. Rand could

2    get more help, like the New York/New Jersey area where Mr. Rand's extended family

3    lives, or the Reno area, where Mr. and Mrs. Rand lived together for some time before Mr.

4    Rand pleaded guilty to the crimes for which he is currently serving his sentence—and

5    where Mrs. Rand presumably has friends that could help out. Mrs. Rand's decision to

6    move to Bakersfield does not seem like an irreversible choice, particularly when living

7    somewhere else might enable her to get more help.

8         Circling back to the requirements the BOP normally imposes on requests for

9    compassionate release based on a caregiver's incapacitation, Mr. Rand failed to submit

10   "verifiable documentation" of either Mrs. Rand's medical conditions, or his relationship to

11   his daughter, such as a birth certificate filed under seal. *See* Compassionate Release

12   Procedures at 7. Regarding Mrs. Rand's condition, as discussed above, Mr. Rand's

13   counsel did not actually submit the letter from Dr. Lee described in the Motion. The only

14   other medical records submitted regarding Mrs. Rand are notes from an MRI apparently

15   requested because Mrs. Rand was suffering from headaches that do not appear to

16   include any abnormal results (ECF No. 800-3 at 5-6), and a forwarded email purporting

17   to list some lab results (*id.* at 7-10) but lacking any corresponding explanation about what

18   they mean, much less a declaration from a doctor interpreting the results. The only

19   evidence the Court has are Mrs. Rand's statements in her letter that she is "anemic, weak,

20   fatigued, with an inflamed liver, and [has] neuropathy in my hands and feet." (*Id.* at 3.)

21   But she also states that she has "not undergone surgery or radiation treatments yet." (*Id.*)

22   Thus, it is difficult to infer from the proffered evidence that Mrs. Rand is unable to care for

23   her daughter. And in any event, the proffered evidence does not necessarily rise to the

24   level of "verifiable documentation."

25        And then there is the issue presented by Mrs. Rand's undisputed success on

26   TikTok. (ECF Nos. 797 at 15, 800 at 12-13, 800-3 at 3.) *See also* Kallyn Hobmann,

27   *Bakersfield cancer patient shares journey on TikTok to inspire others*, 23ABC News

28   Bakersfield (May 18, 2021), https://www.turnto23.com/news/kerns-kindness/bakersfield-

1    cancer-patient-shares-journey-on-tiktok-to-inspire-others. Mrs. Rand apparently has

2    13,000 followers on TikTok, where she shares upbeat short videos about her fight against

3    cancer. *See id.* The Court agrees with the government that this local news story about

4    Mrs. Rand's TikTok success tends to undercut the characterization offered of her in the

5    Motion that she is totally incapacitated—much to Mrs. Rand's credit. It is certainly

6    laudable to put on a brave face against an unwelcome diagnosis and inspire others with

7    uplifting online content. And while the Court does not place much weight on Mrs. Rand's

8    TikTok success as described in this article in terms of finding it weighs against granting

9    Mr. Rand's Motion, the Court also cannot ignore this publicly available and undisputed

10   evidence suggesting Mrs. Rand is not totally incapacitated.

11           As to a release plan, Mr. Rand states he would live with his wife and daughter in

12   Bakersfield, where he would do a mixture of gig work and teach online school to support

13   them. (ECF Nos. 792 at 26, 800-1 at 2.) That could constitute an acceptable release plan

14   but does not fill the glaring evidentiary gaps described above regarding Mrs. Rand's

15   incapacitation, and the other issues with this portion of the Motion described above. In

16   sum, the Court finds that Mr. Rand has presented insufficient evidence to support his

17   argument that his wife is unable to care for their daughter, such that the Court cannot say

18   Mrs. Rand's cancer diagnosis constitutes an extraordinary and compelling reason

19   weighing in favor of Mr. Rand's release. *See, e.g.*, *United States v. Barkley*, Case No.

20   2:17-cr-00025-HDM-VCF, 2021 WL 326130, at *3 (D. Nev. Feb. 1, 2021) (denying motion

21   for compassionate release in part because movant had not shown his children's

22   caregivers had become incapacitated); *United States v. Rahman*, Case No. 2:15-cr-

23   00178-GMN-GWF, 2020 WL 5042782, at *3 (D. Nev. Aug. 24, 2020) ("There is no

24   evidence that Defendant's children have not been sufficiently caring for Defendant's wife

25   for the past two years. As such, the Court does not find extraordinary and compelling

26   reasons to warrant Defendant's release.")

27   ///

28   ///

### C.    Section 3553(a) Factors and Applicable Policy Statements

Further, the Court still does not find the Section 3553(a) factors and applicable policy statements weigh in favor of releasing Mr. Rand. To start, the Court incorporates by reference its discussion of these factors in its prior order denying Mr. Rand's first motion for compassionate release, as not much has changed. (ECF No. 770 at 6-10.) That said, one obvious change is that Mr. Rand has now served another year or more of his sentence. That change weighs in Mr. Rand's favor.

However, Mr. Rand's first argument in his Motion is that he has expressed remorse and taken responsibility regarding his offense conduct. (ECF No. 792 at 21-23.) But this argument is undermined by the operative request for compassionate release Mr. Rand submitted to Lompoc's warden, which he also filed as an exhibit to his Motion. (ECF No. 792-2 at 2.) In that request, Mr. Rand wrote:

There was a tragic death in my case.  It was a non-violent death as far as my part in it anyway.
A young man in his early 30s took 20-30 pain pills at once.
He  consumed a huge amount of alcohol and had a blood alcohol level of 0.249, which  for a reference point is three times the legal limit for driving.
While his death is tragic it was not violent nor was it intentional on my part.

(*Id.*; *see also* ECF No. 797 at 16 (making an argument based on this same excerpt that Mr. Rand continues to minimize his responsibility).) While Mr. Rand does appear to be expressing remorse in calling Mr. Yenick's death 'tragic,' he is not really taking responsibility. Instead, he uses the passive voice to distance himself from Mr. Yenick's death and describes his part in it as unintentional. The Court accordingly finds Mr. Rand's argument that he has expressed remorse about, and taken responsibility for, the offense conduct that he pleaded guilty to unpersuasive.

Mr. Rand next argues that he is a first-time nonviolent offender who has shown no propensity for violence while incarcerated, and points to the positive letters written by the Chaplain and his work supervisor at Lompoc as evidence of his rehabilitation. (ECF No. 792 at 22.) The Court agrees with Mr. Rand that these factors weigh in his favor. However, even considering that more time has now elapsed, they do not clearly outweigh all of the

1 factors the Court discussed in its prior order that led the Court to deny Mr. Rand's first

2 motion for compassionate release. (ECF No. 770 at 6-10.) As best, whether the

3 sentencing factors weigh in favor of releasing Mr. Rand is a closer call now than it was

4 then—but the Court does not find they clearly weigh in favor of releasing him.

5 **V.    MOTIONS TO SEAL**

6        Mr. Rand moves to file exhibits B and D to his Motion under seal. (ECF No. 793.)

7 The government did not oppose the motion. Mr. Rand represents that Exhibit B is a "letter

8 from Melissa Rand's physician" and D are "excerpts of Mr. Rand's medical records from

9 the Bureau of Prisons containing confidential and sensitive information." (*Id.* at 2.)

10 However, Mr. Rand did not submit sealed, unredacted versions of these documents. The

11 Court is therefore unable to determine whether the documents contain what Mr. Rand

12 represents they do, and perhaps more importantly, there is nothing to seal.[5] The Court

13 will accordingly deny Mr. Rand's motion to seal. The Court also notes that Mr. Rand's

14 failure to file sealed copies of the documents he seeks to file under seal violates LR IA

15 10-5, and makes his arguments based on those exhibits impossible to evaluate.

16        The government also moves to seal an exhibit containing Mr. Rand's vaccination

17 medical records under seal. (ECF No. 798.) Mr. Rand did not oppose the motion. The

18 Court finds good cause exists to grant the motion. *See United States v. Motalebi*, Case

19 No. 2:17-cr-34 JCM (NJK), 2021 WL 2583548, at *3 (D. Nev. June 23, 2021) (finding good

20 cause permitting "private medical records" to be filed under seal).

21 **VI.   CONCLUSION**

22        The Court notes that the parties made several arguments and cited to several

23 cases not discussed above. The Court has reviewed these arguments and cases and

24 determines that they do not warrant discussion as they do not affect the outcome of the

25 Motion before the Court.

26        It is therefore ordered that Mr. Rand's motion for compassionate release (ECF No.

27 792) is denied.

28

---

[5]Exhibits B and D to the motion are merely cover pages. (ECF Nos. 792-3, 792-5.)

14

1      It is further ordered that Mr. Rand's motion to seal (ECF No. 793) is denied.

2      It is further ordered that the government's motion to seal (ECF No. 798) is granted.

3 Defendant's vaccination medical records (ECF No. 799) will remain under seal.

4      DATED THIS 24th Day of September 2021.

5

6 _____

7 MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28